**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

Julie Wettersten and I.W. by and through his parent,
Julie Wettersten,
Leanne Sells and H.P. by and through his parent,
Leanne Sells,
Jamilee Jack and K.C. and K.C. by and through their parent,
Jamilee Jack, and
Julie Newsome and C.N, G.N., and S.N. by and through their parent,
Julie Newsome

        Plaintiffs,

        v.

CHILLICOTHE CITY SCHOOL DISTRICT
BOARD OF EDUCATION; DEBORAH SWINEHART,
in her individual capacity and in her official capacity as
Superintendent of the Chillicothe City School
District; and LIZ CORZINE, BILL BONNER,
JEFF HARTMUS, KELLY DENNIS, and SHAWN PORTER,
all in their individual capacities and in their capacities
as members of the Chillicothe City School
District Board of Education,

        Defendants

Civ. No. 2:21-cv-5187

JUDGE MORRISON

MAGISTRATE JUDGE VASCURA

## COMPLAINT

Plaintiffs, I.W. a minor, by and through his parent, Julie Wettersten, H.P. a minor, by and through his parent, Leanne Sells, K.C. and K.C., minors, by and through their parent, Jamilee Jack, and C.N., G.N., and S.N., minors, by and through their Parent Julie Newsome, *pro se*, hereby file this Complaint with Demand for Jury Trial against Defendants, Chillicothe City School District Board of

1

Education ("School Board"); Deborah Swinehart, in her individual capacity and in her official capacity as Superintendent of the Chillicothe City School District; and Liz Corzine, Bill Bonner, Jeff Hartmus, Kelly Dennis, and Shawn Porter, all individual elected officials sued in their individual capacity and in their capacity as members of the School Board (collectively, "Defendants"). In support of the claims set forth herein, Plaintiffs allege and aver as follows:

## INTRODUCTION

Through the unlawful actions of Defendants, Plaintiffs Julie Wettersten, Leanne Sells, Jamilee Jack, and Julie Newsome have been deprived of their right to care for and maintain custody and control of their minor child/children, I.W., H.P, K.C. and K.C., C.N., G.N., and S.N. Specifically, by implementing an unconstitutional universal mask mandate despite having no sound scientific basis for doing so, Defendants have ordered I.W., H.P., K.C. and K.C., C.N., G.N., and S.N. to involuntarily participate in a healthcare service in violation of Article I, § 21 of the Ohio State Constitution, whereby I.W., H.P., K.C. and K.C., C.N., G.N., and S.N. are required to wear a mouth covering and to subject themselves to contract tracing.

As a result, solely at the discretion of Defendants, I.W., H.P., K.C. and K.C., C.N., G.N., and S.N. are required to undergo the perpetual implementation of the collection of healthcare information under the guise of a purported state of emergency. Such an unbridled assault on I.W., H.P., K.C. and K.C., C.N., G.N., and S.N.'s civil liberties should not and *must not* be allowed to stand.

2

In addition, the United States Court of Appeal for the Sixth Circuit has noted, "In reviewing a Complaint, the Court must construe the pleading in the light most favorable to the Plaintiff." *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 561 (6th Cir. 1998). Yet, in reliance on outdated and constitutionally repugnant Sixth Circuit case law, Defendants' attorneys, and even the Court itself, have suggested that *pro se* Plaintiffs in other recent federal cases in Ohio have no legally cognizable right to defend the legal interests of their minor child/children, even though the minor plaintiffs are not recognized by the judicial system as having the ability to bring their own lawsuit against the Defendants due to their status as minors.

The absurd result of such a position would be that Ohioan parents would not be able to represent their minor children *pro se* and instead would have to bear the often exorbitant expense of hiring an attorney to represent the children. Therefore, although parents in Ohio have the financial obligations for and are vicariously liable for the actions of their minor children, they are prohibited from protecting the legal interests of the minor children to which they are financially and vicariously responsible. Such a scenario is devoid of any modicum of rationality.

Moreover, Article I, § 21 of the Ohio State Constitution expressly prohibits federal, state, and local laws or rules from compelling, directly or ***indirectly***, any person, employer, or health care provider to participate in a health care system. Thus, the Constitution of the State of Ohio unambiguously affords individuals like Julie Wettersten, Leanne Sells, Jamilee Jack, and Julie Newsome the right to seek

3

redress from the courts when unconstitutional actions, whether directly or indirectly, infringe upon the rights of Ohioans. Because the universal mask mandate unconstitutionally places I.W., H.P., K.C. and K.C., C.N., G.N., and S.N. in danger of suffering irreparable and immediate injury, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

## PARTIES

1.     Plaintiff I.W. is a minor child who resides in Chillicothe City School District ("CCSD"), in Ross County, Ohio. Plaintiff I.W. is and was at all times relevant hereto a student at a Chillicothe City School District public school. Suit is brought herein on I.W.'s behalf by his mother, Plaintiff Julie Wettersten.

2.     Plaintiff H.P. is a minor child who resides in Chillicothe City School District ("CCSD"), in Ross County, Ohio. Plaintiff H.P. is and was at all times relevant hereto a student at a Chillicothe City School District public school. Suit is brought herein on H.P.'s behalf by his mother, Plaintiff Leanne Sells.

3.     Plaintiffs K.C. and K.C. are minor children who reside in Chillicothe City School District ("CCSD"), in Ross County, Ohio. Plaintiffs K.C. and K.C. are and were at all times relevant hereto students at a Chillicothe City School District

4

public school. Suit is brought herein on K.C. and K.C.'s behalf by their mother, Plaintiff Jamilee Jack.

4.  Plaintiffs C.N., G.N., and S.N. are minor children who reside in Chillicothe City School District ("CCSD"), in Ross County, Ohio. Plaintiffs C.N., G.N., and S.N. are and were at all times relevant hereto students at a Chillicothe City School District public school. Suit is brought herein on C.N., G.N., and S.N.'s behalf by their mother, Plaintiff Julie Newsome.

5.  Plaintiff Julie Wettersten is an adult individual who is a resident and taxpayer in the Chillicothe City School District, in Ross County, Ohio. Plaintiff Julie Wettersten is the parent of Plaintiff I.W.

6.  Plaintiff Leanne Sells is an adult individual who is a resident and taxpayer in the Chillicothe City School District, in Ross County, Ohio. Plaintiff Leanne Sells is the parent of Plaintiff H.P.

7.  Plaintiff Jamilee Jack is an adult individual who is a resident and taxpayer in the Chillicothe City School District, in Ross County, Ohio. Plaintiff Jamilee Jack is the parent of Plaintiffs K.C. and K.C.

8.  Plaintiff Julie Newsome is an adult individual who is a resident and taxpayer in the Chillicothe City School District, in Ross County, Ohio. Plaintiff Julie Newsome is the parent of Plaintiff C.N., G.N., and S.N.

9.  Defendant Chillicothe City School District Board of Education (the "School Board" or the "Board") is a public entity which, acting under color of law, is responsible for the formulation and implementation of all official governmental

laws, policies, regulations and procedures in effect for the Chillicothe City School District.

10. Defendant Deborah Swinehart was at all relevant times the Superintendent of the Chillicothe City School District; in that capacity, acting under color of law, she is responsible for the implementation of all official governmental laws, policies, regulations and procedures governing the Chillicothe City School District. She is sued in her official and individual capacities.

11. Defendant Liz Corzine is a Ross County resident and member of the School Board, sued here in her individual and representative capacity. Mrs. Liz Corzine is currently the President of the School Board.

12. Defendant Bill Bonner is a Ross County resident and member of the School Board, sued here in his individual and representative capacity.

13. Defendant Jeff Hartmus is a Ross County resident and member of the School Board, sued here in his individual and representative capacity.

14. Defendant Kelly Dennis is a Ross County resident and member of the School Board, sued here in his individual and representative capacity.

15. Defendant Shawn Porter is a Ross County resident and member of the School Board, sued here in his individual and representative capacity.

16. At all relevant times hereto, the School Board and the individual Defendants were acting under color of state law.

## JURISDICTION AND VENUE

17.    Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

18.    This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §1331,28 U.S.C. §1343(a)(3), (4), 28 U.S.C. §1367, 28 U.S.C. § 2201, and 42 U.S.C. §1983.

19.    There exists an actual and justiciable controversy between Plaintiffs and Defendant requiring resolution by this Court.

20.    Plaintiffs have no adequate remedy at law.

21.    Venue is proper before the United States District Court for the Southern District of Ohio under 28 U.S.C. §1391 because all parties reside or otherwise are found herein, and all acts and omissions giving rise to Plaintiffs' claims occurred in the Southern District of Ohio.

## FACTS

22.    Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

### A. Chillicothe City School District Board of Education

23.    Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

24.    The Chillicothe City School District Board of Education is composed of five members elected by the citizens of the District. A regular term is four years.

http://go.boarddocs.com/oh/chillicothecity/Board.nsf/goto?
open&id=BMB46P09D259

Members of the Board are elected at large by the qualified voters of the District on a nonpartisan ballot on the first Tuesday following the first Monday in November in odd-numbered years.

Each Board member is elected to a four-year term of office which begins on the first day of January after the election. Terms expire on December 31, except as otherwise provided by law. In a four-year period, terms are staggered so that two members are elected in one-half of the four-year period, and three elected in the other half.

Candidates for election are nominated by petition. In city school districts in which the population is at least 20,000 but less than 50,000, the petition must be signed by 75 qualified electors of the district.

https://go.boarddocs.com/oh/chillicothecity/Board.nsf/Public?
open&id=BMB46S09D25D

25. The five individuals currently serving as School Board Members are Defendants Liz Corzine, Bill Bonner, Jeff Hartmus, Kelly Dennis and Shawn Porter.

26. Plaintiffs cannot confirm whether Defendant Deborah Swinehart, Superintendent of the District, holds a College Degree.

27. Defendant Liz Corzine, the President of the School Board, holds a

Bachelor of Science in Business with a major in Marketing. On January 4, 2016, Mrs. Corzine swore an Oath of Office to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully and impartially discharge her duties as member of the School Board (though she is now President of the School Board) to the best of her ability, and in accordance with the laws "now in effect and hereafter to be enacted" **See Exhibit A.**

28. Defendant Bill Bonner has a Bachelor's degree from the University of Dayton and a Master's degree from Ohio University. On January 4, 2018, Mr. Bonner swore an Oath of Office to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully and impartially discharge his duties as member of the School Board to the best of his ability, and in accordance with the laws "now in effect and hereafter to be enacted" **See Exhibit B.**

29. Plaintiffs cannot confirm whether defendant Jeffrey Hartmus holds a college degree. On January 4, 2018, Mr. Hartmus swore an Oath of Office to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully and impartially discharge his duties as member of the School Board to the best of his ability, and in accordance with the laws "now in effect and hereafter to be enacted" **See Exhibit B.**

30. Plaintiffs cannot confirm whether defendant Kelly Dennis holds a college degree. On January 25, 2021, Mr. Dennis swore an Oath of Office to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully and impartially discharge his duties as member of the School Board to

9

the best of his ability, and in accordance with the laws "now in effect and hereafter to be enacted" **See Exhibit C.**

31. Plaintiffs cannot confirm whether defendant Shawn Porter holds a college degree. On January 11, 2021, Mr. Porter swore an Oath of Office to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully and impartially discharge his duties as member of the School Board to the best of his ability, and in accordance with the laws "now in effect and hereafter to be enacted" **See Exhibit D.**

32. As Superintendent, Deborah Swinehart is charged with the administration of the CCSD.

**B.     Relevant Policies of the Chillicothe City School District Board of Education**

33. Code AD of Section A: Foundations And Basic Commitments of the School Board's policy manual, titled **"Development of Philosophy of Education"** provides, in pertinent part,

The Board's philosophy of education gives direction to the educational program and daily  operations of the District.

Periodically, the policy committee of the Board and the Superintendent evaluate the philosophy of education.  ***Suggestions from both the staff and community are considered.***

 **See Exhibit E.**

http://go.boarddocs.com/oh/chillicothecity/Board.nsf/goto?open&id=BMB46609D241

(Emphasis added)

34. In addition, the Board's Policy Manual at Section A: Foundations And Basic Commitments, Code ABA (also KC) titled complaint **"Community Involvement in Decision Making"** provides, in pertinent part,

**Community participation in the schools is essential to promote and maintain the quality of education for all students.**
**In addition to electing fellow citizens to represent them on the Board, all citizens may express ideas, concerns and judgments about the schools to the administration, to the staff, to any appointed advisory bodies and ultimately to the Board.** Ideas should be addressed to the responsible individual in an appropriate fashion.
Residents may be invited by the Board to act as advisors, individually and in groups, in such areas as:
1. clarifying general ideas and attitudes held by residents in regard to the schools;
2. **assisting in developing Board policies under which the District is to be managed;**
3. assisting in establishing administrative arrangements and regulations designed to help implement these policies;
4. determining the purposes of curriculum and special services to be provided for students;
5. evaluating the extent to which these purposes are being achieved by present policies and/or
6. studying a specific problem or set of closely related problems about which a decision must be made.

**See Exhibit F.**

http://go.boarddocs.com/oh/chillicothecity/Board.nsf/goto?
open&id=BMB45T09D233

(Emphasis added)

35. In addition, the Board's Policy Manual at Section B: School Board Governance And Operations titled **"Board Operation Goals"** Code BA provides, in pertinent part,

The primary responsibility of the Board is to establish purposes, programs and procedures which produce the educational achievement needed by District students. The Board is also responsible for wise management of resources available to the District. The Board must fulfill these responsibilities by functioning primarily as a legislative body to formulate and adopt policy, by selecting an executive officer to implement policy and by

11

evaluating the results.  The Board carries out its functions openly, **while seeking the involvement and contributions of the public, students and staff in its decision-making processes.**

**See Exhibit G.**

http://go.boarddocs.com/oh/chillicothecity/Board.nsf/goto?
open&id=BMB46N09D258

(Emphasis added)

36.     In addition, the Board's Policy Manual at Section B: School Board Governance And Operations titled **"Board Policy Development and Adoption"** Code BF provides, in pertinent part,

Proposals regarding Board policies and operations may originate at any of several sources, **including students, community residents, employees, Board members, consultants or civic groups.  A careful and orderly process is used when examining policy proposals prior to Board action.**

The formal adoption of policies is recorded in the minutes of the Board.  **Only those written statements so adopted and recorded are regarded as official Board policy.**

Policies introduced and recommended to the **Board should not be adopted until a subsequent meeting in order to permit further study and provide opportunity for interested parties to react.**  However, *__temporary__* approval may be granted by the Board in lieu of formal adoption to address emergency conditions or special events which may occur before formal action can be taken.

**See Exhibit H.**

http://go.boarddocs.com/oh/chillicothecity/Board.nsf/goto?
open&id=BMB47W09D28D

(Emphasis added)

37.     In addition, Board Policy Manual Section B: School Board Governance And Operations titled **"Policy Review and Evaluation"** Code BFG provides, in pertinent part,

The Board reviews its policies on a continuing basis in an effort to keep its written policies **consistent with community values and compliant with Federal and State law**. Well-written, consistent and compliant policies may be used as a basis for Board action and administrative decisions.

The Board evaluates how the policies have been executed by the staff and weighs the results. It relies on **staff, students and the community for providing evidence of the effect of the policies which it has adopted.**

**See Exhibit I.**

http://go.boarddocs.com/oh/chillicothecity/Board.nsf/goto?
open&id=BMB48309D294

(Emphasis added)

38.     In addition, Board Policy Manual Section A: Foundations And Basic Commitments titled **"Educational Philosophy"** Code ADA provides, in pertinent part,

District Core Values

We believe that:

**All children can learn.**

\*\*\*

**Teaching and learning take place in safe and healthy environments.**

\*\*\*

**Impact on students is considered in all decisions.**

\*\*\*

All students are provided an **abundance of opportunities to meet their individual needs.**

**See Exhibit J.**

39.     In addition, Board Policy Manual Section B: School Board Governance And Operations titled **"Board Member Code of Ethics"** Code BBF-E provides, in pertinent part,

13

While serving as a member of my Board of Education, I accept the responsibility to improve public education.  To that end I will:

remember that my first and greatest concern must be the **educational welfare of all students** attending the public schools;

**obey the laws of Ohio and the United States;**

**See Exhibit K.**

40.     Finally, Board Policy Manual Section A: Foundations And Basic Commitments titled **"School District Legal Status"** Code AA provides,

The United States Constitution grants the individual states responsibility for public education.

The Ohio General Assembly is under mandate by the Ohio Constitution to provide for the organization, administration and control of the public school system supported by public funds.  The Ohio Constitution also mandates a State Board of Education (SBOE) and a Superintendent of Public Instruction, the respective powers and duties of which are prescribed by State law.

 The Ohio General Assembly has also established a State Department of Education (through which policies and directives of the SBOE and Superintendent of Public Instruction are administered) and has established specific types of school districts.

The Chillicothe City School District is classified as a city school district governed by a locally elected Board of Education.

**See Exhibit L.**

http://go.boarddocs.com/oh/chillicothecity/Board.nsf/goto?
open&id=BMB45S09CC0E

**C. CCSD's COVID-19 Based Measures**

41.     On August 2, 2021, the CCSD issued a letter (**See Exhibit M.**) to

14

Chillicothe City School families, signed by Superintendent Deborah Swinehart in

which the CCSD stated, in pertinent part,

**Bus Route Information**

"**All students riding the bus are required by state law to wear a mask** during their ride, please let your driver know if your child needs a mask."

**COVID Protocols**

"Unfortunately, we are still navigating issues and requirements around COVID. At present the CDC isn't requiring masks, outside of bus riders, but is **strongly recommending that all individuals wear a mask when indoors especially in areas of substantial or high transmission.**
Ross county is considered to be an area of substantial transmission, at this time. Below are the COVID protocols that the Chillicothe City School District will have in place effective immediately.
\* **All bus riders are required to wear a mask while on the bus**, this includes transportation to and from athletic events.
\*All teachers and drivers will keep a seating chart for **contact tracing purposes**.
\*All classrooms and athletic facilities will be stocked with hand sanitizer, sanitizing cloths and will be disinfected through daily custodial cleaning.
\*All students and staff should wash their hands frequently.
\***Student health assessments will be conducted at the start of each day,** temperatures will not be taken **at this time.**
\*Students that are not feeling well should be kept home. Students that are ill during school hours will be sent home.
\***Staff and students ages 12 and over are strongly encouraged to be vaccinated.**
\*Quarantine requirements under the Ross County Health District are still in effect for staff, students and athletes.
\*The district will continue to work with the Ross County Health District and will adjust our COVID protocols depending on the transmission rate in Ross County.
**While masks are not required at this time, I am recommending that staff and students wear a mask while indoors regardless of vaccination status. Please understand that the need to change our requirement to wear a mask while indoors may change over the coming weeks.**"

15

42. On August 17, 2021, the CCSD issued a letter (see **Exhibit N.**) signed by Superintendent Deborah Swinehart and an "all-call" message from Ms. Swinehart to Chillicothe City school parents in which it was stated,

"Dear CCSD Families,

Good Evening,

As you are aware Ross County continues to wrestle with a high transmission of COVID for all ages. After much discussion with the Chillicothe City School District Board of Education, the Ross County Health District, the CCSD nurses, and careful consideration of the recommendations from the CDC and the American Pediatrics Association the Chillicothe City School District **will require masks for all staff, students, and visitors through September 10, 2021.** I will work with the Board of Education and the Ross County Health District to re-evaluate whether or not a continued mask requirement is necessary prior to September 10, 2021, and it may be that we evaluate this on a weekly basis.

I understand that this decision may be frustrating to some, and a relief to others. I hope that you understand our priority is to keep our students and staff healthy, in school and able to participate in their athletic events. The CCSD staff, students, and families did an excellent job of controlling the transmission of COVID for an entire year, and as a result our students were in school all year. The updated quarantine guidelines for classrooms leave little room for unmasked students and staff from being quarantined, if exposed. The updated quarantine guidelines have contributed to this decision regarding masks, as we have limited substitutes available and having students at home is not our desire.

On behalf of the CCSD Board of Education, staff, and myself, I appreciate your understanding of this decision and hope that you will continue to support our district as we continue to navigate through the challenges of keeping students in school during the pandemic. I will communicate all updates about Covid through Final Forms."

43. On September 8, 2021, the CCSD issued a letter (see **Exhibit O.**) signed by Superintendent Deborah Swinehart via Final Forms to Chillicothe City school parents in which the CCSD stated,

"Dear CCSD Families & Students,

16

**The Chillicothe City School District will continue to require all students, staff and visitors to wear a mask while at school.** The district continues to collaborate with the Ross County Health District and follow the guidance document posted on the Ohio Department of Education website COVID -19 Health and Prevention Guidance for Ohio K-12 Schools 2021-2022 (see **Exhibit P.)**. This document will be posted on the district website for your review. I understand that there are many views on masking, and I respect your personal position on the topic, but at this time it is important to keep our students in school. As changes are made I will keep you updated through Final Forms."

44.    The attached Covid-19 Face Covering Policy (see **Exhibit Q**) was e-mailed to Plaintiff Julie Wettersten on September 9, 2021 as part of a prior records request from the CCSD Treasurer. Said policy was adopted by the CCSD on August 3, 2020 for the 2020 - 2021 School Year. No additional written policies have been obtained by Plaintiff that have since been adopted by the Board for the 2021-2022 school year thus far per the records request. The records request from Plaintiff was for **written district policies or letters pertaining to mask requirements within the district for the 2021-2022 school year (or any prior policies still in place that are in effect)**. The attached Policy was sent to Plaintiff as part of that request:

"COVID-19 Face Covering Policy

[Note, districts should check with their local officials regarding any city ordinances regarding face masks to resolve any conflicts if necessary.]

<u>Staff:</u>

All school staff members must wear a face covering made of cloth/fabric that covers the employee's nose, mouth, and chin, unless covered by an exception recognized by the Ohio Department of Health. A face shield made of flexible plastic that wraps around the wearer's face and extends below his or her chin may be an acceptable face covering under certain circumstances as determined by the Superintendent. "Staff members" is an inclusive term and includes but is not limited to all salaried and hourly employees, vendors, contractors and volunteers.

17

A staff member may be required to answer questions and/or supply documentation as appropriate if he or she requests not to wear a face covering. The Superintendent or his or her designee's decision to grant or deny an exception or whether a face shield may be used is final.

**Students:**

All students in grades 3-12 must wear face coverings while: (1) on a school district bus, (2) in the hallways and common areas of school buildings, and (3) in classrooms.

Requests for exceptions under this section as well as those necessary for students with a documented health or developmental condition shall be considered by the Superintendent/designee, who may request documentation justifying the exemption.

The District will not tolerate harassment of students who are wearing face coverings or those with recognized exemptions to the face covering requirement and will appropriately discipline students or staff who harass or bully students with exemptions or engage in behavior that interferes with any student or staff member's ability to comply with this policy.

**General Provisions:**

Failure or refusal to wear a required face covering by a staff member or student may result in discipline in accordance with other District policies, handbooks, and/or codes of conduct, as applicable. If a student who is required to wear a face covering does not have one, he or she will be provided an acceptable face covering by a staff member. This policy shall supersede any conflicting provisions in other District policies, handbooks or procedures. The Board authorizes the Superintendent to amend these requirements as necessary to meet federal and state guidelines."

**D. Plaintiffs Place Defendants on Notice of Lawsuit.**

45. Upon receiving Superintendent Deborah Swinehart's "all-call" phone call on September 17, 2021, Plaintiff Julie Wettersten, e-mailed a signed letter in response to Superintendent Deborah Swinehart and others, putting whomever it concerned on notice that the attached letter, in pertinent part, "served as official notice that Plaintiff I.W. does not consent to being forced to wear a mask and that Plaintiff I.W.'s advocates would not fail to take the maximum action permissible

under the law against your organization, and against you personally. Accordingly, I urge you to comply with Federal and State law, and advise children they have a right to refuse or wear a mask as a measure to prevent or reduce infection from COVID-19. Any other course of action is contrary to the law. Please confirm no further pressure will be exerted upon Plaintiff I.W. to follow this illegal mask mandate, and that Plaintiff I.W. will not face any retaliatory disciplinary action."

46. Upon receiving no response from the Superintendent to the initial letter e-mailed on August 17, 2021, Mrs. Wettersten made two subsequent in-person appearances at school board meetings on August 23, 2021 and September 27, 2021. Mrs. Wettersten raised concerns regarding the safety, efficacy, and the law regarding universal masking without informed consent. Once again, after no response from the Superintendent to address the concerns, Mrs. Wettersten e-mailed and hand delivered a response to the Defendants on October 27, 2021 at the Board Office informing them that above listed Plaintiffs would be filing a lawsuit due to the Defendants' violation of open meetings laws and violation of the United States and Ohio Constitutions through their commission of unauthorized restrictions of liberty; identification of a minor as a potential public health risk with no jurisdiction; identification and declaration of a minor as a potential public health risk with no evidence; declaration of mandates to restrict a minor's liberty with no legal jurisdiction; declaration of mandates that have no legal jurisdiction to restrict civil liberties; declaration of mandates restricting liberties with no prior public comment; declaration of mandates imposing dress code that does not align with dress code regulations; declaration of mandates as medical experts; and deprivation of students' and parents' civil liberties with no authority."
See **Exhibit S**.

47. In her letter, Mrs. Wettersten also informed Defendants that she was

19

sending a copy of the letter to the Ohio Attorney General David Yost, a copy of the letter is attached hereto as **Exhibit S.**

**E. The Masking Requirement Causes Immediate and Irreparable Harm to Students, Staff, and Community.**

48.     In his signed Declaration, attached hereto as **Exhibit T**, Stephen E. Petty, an expert in the field of Industrial Hygiene who has testified as to the futility and danger caused by an individual wearing a mask in order to avoid transmitting or becoming infected with Covid-19, states the following:

\*\*\*

1.     I am an adult in sound mind and body. I am competent to make this declaration. I have volunteered to testify as an expert witness in support of Plaintiffs' Motion for Preliminary Injunction.

2.     I have personal knowledge of the facts stated herein.

3.     Since April 14, 1996, I have owned and operated EES Group, Inc., a forensic engineering and consultancy specializing in health and safety.

4.     I hold relevant industry certifications including C.I.H. (Certified Industrial Hygienist), C.S.P. (Certified Safety Professional), and as a P.E. (Professional Engineer) in six states (Florida, Kentucky, Ohio, Pennsylvania, Texas, and West Virginia). My curriculum vitae is attached as **Exhibit i**.

5.     I have served as an expert in personal protective equipment and related disciplines in approximately 400 legal cases. I have often been certified as, and provided testimony as, an expert in these areas. My list of representative cases is attached as **Exhibit ii**.

6.     For example, I am currently serving as an expert in the Monsanto Roundup, DuPont C-8, and 3-M PFAS litigation. Recently I testified in four trials related to the Dupont C-8 litigation.

20

7.      I taught Environmental and Earth Sciences as an adjunct professor at Franklin University.

8.      I hold nine U.S. patents, most related to heating, ventilation, and air conditioning systems.

9.      I am a current member in good standing of the following relevant associations: American Industrial Hygiene Association (AIHA), American Board of Industrial Hygiene (ABIH), American Conference of Governmental Ind. Hygienists (ACGIH), American Institute of Chemical Engineers (AIChE), American Society of Refrigeration, Air Conditioning and Refrigeration Engineers (ASHRAE); Member ASHRAE 40 Std. and TC 2.3, and Sigma Xi.

10.      I am an expert in the field of Industrial Hygiene, which is the science and art devoted to the anticipation, recognition, evaluation, and control of those environmental factors or stressors — including viruses — arising in or from the workplace, which may cause sickness, impaired health and well-being, or significant discomfort among workers or among the citizens of the community.

11.      Industrial Hygiene is fundamentally concerned with the proper methods of mitigating airborne/dermal hazards and pathogens, as well as with the design and use of personal protective equipment, among other things.

12.      Industrial hygienists refer to a "Hierarchy of Controls" that are typically implemented to minimize exposures, including exposures to very small airborne aerosols like SARS-CoV-2, the virus that causes COVID-19.



13. Regarding practical or "engineering" controls, industrial hygienists focus on practices that dilute, destroy, or contain airborne hazards (or hazards in general).

14. Personalized Protective Equipment (PPE) — especially facial coverings — do not dilute, destroy, or contain airborne hazards. Therefore, facial coverings are not part of the Industrial Hygiene (IH) Hierarchy of Controls. Even respirators (part of the PPE Category and classified separately from masks) are in the last priority on the Hierarchy of Controls.

15. Medical doctors, virologists, immunologists, and many public health professionals are experts at how a virus behaves inside the human body, but are not qualified experts in how the virus behaves outside of the human body. This is the purview of industrial hygiene and infection control.

16. On May 7, 2021, the Centers for Disease Control (CDC) updated its guidance, providing that the primary mechanism for transmission of Covid-19 is through airborne aerosols, and not as the CDC previously stated, by touching contaminated surfaces or through large respiratory droplets.[1]

---

1 **Exhibit iii**. https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html

17.     Airborne viral aerosols can consist of a single viral particle or multiple viral particles clumped together, and usually smaller than 5 μm (microns) in size. Covid aerosols are 0.1 μm in size. By comparison, droplets are >5 μm to >10 μm in size.

18.     A square micron is approximately 1/4000[th] the area of the cross-section of a human hair and 1/88[th] the diameter of a human hair.  SARS-CoV-2 particles are ~1/10 of a micron or ~1/40,000[th] the area of a cross section of a human hair or ~1/880[th] the diameter of a human hair.

19.     A recent University of Florida study capturing air samples within an enclosed automobile cabin occupied by a Covid-positive individual showed that the only culturable Covid-19 virus samples obtained were between 0.25 μm to 0.5 μm in size.[2] Particles smaller than 5 μm are considered very small and/or very fine or aerosols.

20.     Very small particles do not fall by gravity in the same way that larger particles are and can stay suspended in still air for a long time, even days to weeks.

21.     Because they stay suspended in concentration in indoor air, very small particles can even accumulate and become more concentrated over time if the ventilation is poor.

22.     Very small airborne aerosols pose a particularly great risk of exposure and infection because, since they are so small, they easily reach deep into the lung. This explains in part why Covid-19 is so easily spread, and why so little Covid-19 is required for infection.

23.     Exposure to airborne aerosols is a function of two primary parameters: concentration and time. Less is better regarding both parameters. However, in a school environment, it is difficult to limit the amount of time students spend in a classroom.

24.     For many reasons, personal protective equipment (PPE) is the <u>least</u> desirable way to protect people from very small airborne aerosols.  A device referred to as a respirator (commonly referred to as an N95 Respirator) is required to

---

2     **Exhibit iv**. Lednicky, John A. et al. "Isolation of SARS-CoV-2 from the air in a car driven by a COVID patient with mild illness." *International Journal of Infectious Diseases*, Vol. 108, P212-216, July 1, 2021. DOI: https://doi.org/10.1016/j.ijid.2021.04.063.

provide such protection. Moreover, masks are not PPE since they cannot be sealed and do not meet the provisions of the Occupational Safety and Health Administration (OSHA) Respiratory Protection Standard (RPS), namely 29 CFR 1910.134.[3]

25.     The AIHA, (Exhibit iii) in its September 9, 2020 Guidance Document for COVID-19 noted that only risk reduction methods that provide greater than a 90% relative risk reduction should be considered; masks were shown to provide no greater than a 10% relative risk reduction (see Figure 2), and far below the required 90% threshold.[4]

26.     Similarly, a paper published on July 21, 2021 in the Journal *Physics of Fluids*, using ideally sealed masks and particles 1 μm in size, reported efficiencies for the more commonly used cloth masks and surgical masks of 10% and 12%, respectively.[5] No mask can be perfectly sealed; thus "real world" effectiveness – particularly for children - is even lower.

27.     Facial coverings are not comparable to respirators. Leakage occurs around the edges of ordinary facial coverings. According to the CDC's National Institute for Occupational Safety and Health, surgical masks "do NOT provide the wearer with a reliable level of protection from inhaling smaller airborne particles and is not considered respiratory protection. Leakage occurs around the edge of the mask when the user inhales."

---

3    **Exhibit v.** https://www.osha.go/laws-regs/regulations/standardnumber/1910/1910.134. Accessed September 24, 2021.

4    **Exhibit vi.** https://aiha-assets.sfo2.digitaloceanspaces.com/AIHA/resources/Guidance-Documents/Reducing-the-Risk-of-COVID-19-using-Engineering-Controls-Guidance-Document.pdf. *See* FIG. 2.

5    **Exhibit vii.** Shah, Yash et al. "Experimental investigation of indoor aerosol dispersion and accumulation in the context of COVID-19: Effects of masks and ventilation." Phys. Fluids 33, 073315 (2021); https://doi.org/10.1063/5.0057100.

28. Thus, ordinary facial coverings <u>do not</u> provide a reliable level of protection against inhalation of very small airborne particles and are not considered respiratory protection. The inability of the masks to achieve proper fit is particularly pronounced in children.

29. For example, during the seasonal forest fires in the summer of 2020, the CDC issued public guidance warning that facial coverings provide no protection against smoke inhalation. That is because facial coverings do not provide a reliable level of protection against the small particles of ash contained in smoke. Ash particles are substantially larger than Covid-19 aerosolized particles.

30. I have reviewed the Chillicothe City School District (CCSD) current mask requirement as set forth in the letter from the Superintendent dated August 17, 2021 which mandates that staff, students, and visitors wear masks at all times while at school, which was extended on September 8, 2021 per an additional letter from the Superintendent. I have also reviewed the Covid-19 Face Covering Policy as provided to Plaintiff Julie Wettersten by the CCSD Treasurer on September 9, 2021 per Mrs. Wettersten's prior records request. The CCSD Face Covering Policy does not mandate a minimum standard for facial coverings in its schools for students, although it does state that staff's masks must be a cloth/fabric and cover the nose, mouth, and chin.

31. Ordinary facial coverings like the ones required by the CCSD mask mandate do not meet any of the several key OSHA Respiratory Protection Standards (RPS) for respirators.

32. Because of the gaps around the edges of facial coverings required by CCSD' policy, they do not filter out Covid-19 aerosols.

33. Most over-the-counter disposable facial coverings have edge gaps of 10% or more. When adult-sized facial coverings are used by children, edge gaps will usually greatly exceed 5%. Ordinary facial coverings like the ones required by the CCSD mandate do not provide any filtering benefit relative to particles smaller than 5 μm if not sealed.

34. One study found that for aerosols < 2.5µm, mask filtration efficiency decreases by 66% for a relative leak area of 2%.[6] Therefore, the effectiveness of a facial covering falls to essentially zero when there is a 3% or more open area in the edges around the sides of the facial covering.

35. The following picture from the Chillicothe City School District Schools social media page demonstrating the continued and current use of masks in Chillicothe City Schools' classrooms illustrates how poorly a standard surgical mask fits a child. The mask has large openings on both sides, which greatly exceed 10%, making this mask completely ineffective.



36. Substantial mitigation of Covid-19 particles could be immediately achieved by:

  a. opening windows and using fans to draw outdoor air into indoor spaces (diluting the concentration of aerosols),

  b. setting fresh air dampers to maximum opening on HVAC systems,

  c. overriding HVAC energy controls,

6 **Exhibit viii**. F. Drewnick, J. Pikmann, F. Fachinger, L. Moormann, F. Sprang, S. Borrmann, Aerosol filtration efficiency of household materials for homemade face masks: Influence of material properties, particle size, particle electrical charge, face velocity, and leaks. Aerosol Sci. Technol. 55, 63–79 (2021).

      d.  increasing the number of times indoor air is recycled,

      e.  installing needlepoint ionization technology to HVAC intake fans, and

      f.  installing inexpensive ultraviolet germicide devices into HVAC systems.

37.     All of the above-referenced techniques are more effective and meet standard Industrial Hygiene Hierarchy of Controls (practices) for controlling exposures. The Hierarchy of Controls has been in place for nearly 100 years.

38.     The use of cloth facial coverings does not fit within the basic Hierarchy of Controls since masks are not PPE and cannot be sealed. There are no OSHA standards for facial coverings (masks) as respiratory protection.

39.     Extended use of respiratory PPE is not indicated without medical supervision.

40.     There are a wide variety of well-known negative effects from wearing masks that have been thoroughly studied and reported for years. As explained in a paper published on April 20, 2021 in the *International Journal of Environmental Research and Public Health,* reviewing 44 experimental studies and 65 publications on adverse effects from masks, measurable physical effects including increased heart rates, respiratory rates and elevated $CO_2$ retention were noted even from wearing surgical masks for as few as 30 minutes.[7]

41.     In one of the referenced studies of 12 healthy young students, investigators observed dizziness, listlessness, impaired thinking, and concentration problems when wearing masks.[8]

---

7    **Exhibit ix**. Kisielinski, Kai et al. "Is a Mask That Covers the Mouth and Nose Free from Undesirable Side Effects in Everyday Use and Free of Potential Hazards?." *International Journal of Environmental Research and Public Health*, vol. 18, 8 4344. 20 Apr. 2021, doi: 10.3390/ijerph18084344 (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8072811/

8 *Id.* At 7.

42. The paper summarized a lengthy list of negative effects from wearing masks that were reported in the literature, as follows:

| Increased risk of adverse effects when using masks: | | |
| --- | --- | --- |
| **Internal diseases**<br>COPD<br>Sleep Apnea Syndrome<br>advanced renal Failure<br>Obesity<br>Cardiopulmonary Dysfunction<br>Asthma | **Psychiatric illness**<br>Claustrophobia<br>Panic Disorder<br>Personality Disorders<br>Dementia<br>Schizophrenia<br>helpless Patients<br>fixed and sedated Patients | **Neurological Diseases**<br>Migraines and Headache Sufferers<br>Patients with intracranial Masses<br>Epilepsy |
| **Pediatric Diseases**<br>Asthma<br>Respiratory diseases<br>Cardiopulmonary Diseases<br>Neuromuscular Diseases<br>Epilepsy | **ENT Diseases**<br>Vocal Cord Disorders<br>Rhinitis and obstructive Diseases<br><br>**Dermatological Diseases**<br>Acne<br>Atopic | **Occupational Health Restrictions**<br>moderate / heavy physical Work<br><br>**Gynecological restrictions**<br>Pregnant Women |

**Figure 5.** Diseases/predispositions with significant risks, according to the literature found, when using masks. Indications for weighing up medical mask exemption certificates.

Example statements made in the paper include the following: "The overall possible resulting measurable drop in oxygen saturation ($O_2$) of the blood on the one hand and the increase in carbon dioxide ($CO_2$) on the other contribute to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase, in some cases also to a significant blood pressure increase." In fact, "Neither higher level institutions such as the WHO or the European Centre for Disease Prevention and Control (ECDC) nor national ones, such as the Centers for Disease Control and Prevention, GA, USA (CDC) or the German RKI, substantiate with sound scientific data a positive effect of masks in the public (in terms of a reduced rate of spread of COVID-19 in the population)." For these reasons, students who are required to wear masks pursuant to a mandate suffer immediate and irreparable injury, loss, or damage.

43. The authors note: "The overall possible resulting measurable drop in oxygen saturation ($O_2$) of the blood on the one hand and the increase in carbon dioxide ($CO_2$) on the other contribute to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase, in some cases also to a significant blood pressure increase."[9]

---

9 *Id.* At 7.

28

44.  In summarizing their findings, the authors conclude "…there are clear, scientifically recorded adverse effects for the mask wearer, both on a psychological and on a social and physical level."[9]

45.  For these reasons, students who are required to wear masks in school pursuant to the CCSD mandate likely will suffer immediate and ongoing injury, both psychological, social, and physical – which is detrimental to the learning environment.

7.  A recent summary of the literature on these topics shows:

   a.  PPE is the least desirable way to protect people from very small airborne aerosols.

   b.  Facial coverings as required by the CCSD policy are not recognized as PPE since they cannot be sealed and are not covered by the OSHA RPS.

   c.  If PPE were to be used for protection, respirators, not facial coverings as required by the CCSD policy, are needed to provide any effective protection from very small airborne aerosols.

   d.  Very small aerosol particles are more likely to be a greater cause of disease than respiratory droplets because they can evade PPE and reach deep into the lungs, whereas respiratory droplets have to work against gravity in order to travel up a person's nose into the sinus and typically rapidly fall to the ground.

   e.  Much better alternatives to controlling exposure are available (i.e., engineering controls of dilution – ventilation and destruction), and should be used to minimize exposures as opposed to masks.

   f.  Based on cited literature, individuals who are required to wear masks pursuant to a mandate have the known potential to suffer immediate and irreparable injury due to a measurable drop in oxygen saturation of the blood and increased carbon dioxide saturation levels, which contribute to an increased noradrenergic

29

stress response, with associated heart rate and respiratory rate increases, and in some cases, a significant blood pressure increase.

49. Plaintiffs note that the state of Ohio was given $4,475,243.513 pursuant to the American Rescue Plan ("ARP") Act of 2021 by agreeing to implement the federal guidelines set forth by the CDC for COVID-19 mitigation efforts. See the attached letter from the U.S. Secretary of Education, attached hereto as **Exhibit R**. See also, https://oese.ed.gov/files/2021/07/Ohio-ARPESSER-State-Plan-Highlights-v2-071421.pdf. The letter links to the CDC guidelines available at https://www.cdc.gov/coronavirus/2019-ncov/community/schoolschildcare/operationstrategy.html. The guidelines suggest that a school board would forfeit ARP allocations by making masks optional, and states that have prohibited mask mandates in schools have received letter notifying them that they will not receive ARP funds. Accordingly, it seems Defendants have a financial incentive for implementing the mask mandate, despite that such a requirement serves no scientific purpose and subjects individuals who wear masks to the health risks discussed above.

50. Plaintiff Julie Wettersten, in her own capacity and on behalf of her minor child, I.W., is aggrieved by the immediate and irreparable injury, loss, and damage suffered by I.W. because I.W. is required to wear a mask pursuant to the School Board's mask mandate, which is not only unsupported by science, but which also results in the possible resulting measurable drop in oxygen saturation of the blood on one hand and the increase in carbon dioxide on the other, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

51. Plaintiff Leanne Sells, in her own capacity and on behalf of her minor

child, H.P., is aggrieved by the immediate and irreparable injury, loss, and damage suffered by H.P. because H.P. is required to wear a mask pursuant to the School Board's mask mandate, which is not only unsupported by science, but which also results in the possible resulting measurable drop in oxygen saturation of the blood on one hand and the increase in carbon dioxide on the other, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

52.     Plaintiff Jamilee Jack, in her own capacity and on behalf of her minor children, K.C and K.C., is aggrieved by the immediate and irreparable injury, loss, and damage suffered by K.C. and K.C. because K.C. and K.C. are required to wear a mask pursuant to the School Board's mask mandate, which is not only unsupported by science, but which also results in the possible resulting measurable drop in oxygen saturation of the blood on one hand and the increase in carbon dioxide on the other, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

53.     Plaintiff Julie Newsome, in her own capacity and on behalf of her minor children, C.N., G.N., and S.N., is aggrieved by the immediate and irreparable injury, loss, and damage suffered by C.N., G.N., and S.N., because C.N., G.N., and S.N., are required to wear a mask pursuant to the School Board's mask mandate, which is not only unsupported by science, but which also results in the possible resulting measurable drop in oxygen saturation of the blood on one hand and the increase in carbon dioxide on the other, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

31

## COUNT I - 42 U.S.C. §1983 - Violation of Procedural Due Process
## (5th and 14th Amendments) Against All Defendants

54.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

55.     In order establish a claim under section 1983 of the Civil Rights Act, a plaintiff must prove a Defendant: (a) acted under the color of state law; (b) proximately causing; (c) the Plaintiff to be deprived of a federally protected right. 42 U.S.C. §1983.

56.     In the instant case, Defendants unquestionably acted under the color of state law.

57.     Each Individual Defendant is an elected, voting member of the Chillicothe City School District Board of Education with the exception of Defendant Deborah Swinehart, who is the Superintendent of the Chillicothe City School District.

58.     Under the Fifth Amendment to the Constitution, no person may be deprived of life, liberty, or property without due process of law. U.S. Const. Ann., Amendment V.

59.     The Fourteenth applies the protections of the Fifth Amendment to state actors. U.S. Const. Ann., Amendment XIV.

60.     Plaintiffs have constitutionally protected interests in the benefits that come from the not being subject to the Board's mask mandate, including the ability to pursue an education without being subjected to health risks that are not offset by any scientifically provable benefits.

61.     Defendants' implementation of the mask policy unlawfully deprives Plaintiffs of these and other constitutionally-protected interests without due process of law. Such deprivation occurred with no notice or meaningful opportunity to be

heard as the Superintendent instated the mask mandate prior to offering an opportunity for public discussion. Such deprivation was arbitrary, capricious, based on ignorance without inquiry into facts, and in violation of the School Board's own policies and other applicable laws. Such deprivation violates the Fifth and Fourteenth Amendments of the United States Constitution.

62.     Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

**COUNT II - 42 U.S.C. §1983 - Violation of Substantive Due Process (Fourteenth Amendment) – Against All Defendants**

63.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

64.     In the instant case, Defendants unquestionably acted under the color of state law.

65.     Each individual Defendant is an elected, voting member of the Chillicothe City School District Board of Education with the exception of Defendant Deborah Swinehart, who is the Superintendent of the Chillicothe City School District.

66.     Under the Fourteenth Amendment to the Constitution, and as established by state law including the state created danger doctrine, Plaintiffs have a fundamental right to a public education and to an education in a safe and healthy environment.

67.     Plaintiffs were harmed and continue to be irreparably harmed by these

33

unlawful acts, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

### COUNT III - Violation of Ninth Amendment Against All Defendants

68.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

69.     Under the Ninth Amendment to the Constitution, "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

70.     Nothing in the United States Constitution states or even suggest that parents of minor children do not have the right to seek redress in the courts in order to protect the health and safety of their children, and thus, Plaintiffs Julie Wettersten, Leanne Sells, Jamilee Jack, and Julie Newsome retain this right to protect their minor child/children, Plaintiffs  I.W., H.P., K.C. and K.C., G.N., C.N., and S.N.

71.     By relying on scientifically unfound and constitutionally repugnant guidance by federal government agencies and enacting an oppressive a dangerous universal mask mandate in misguided reliance on the information provided by the federal government, Defendants have violated Plaintiffs' Ninth Amendment rights by usurping Plaintiffs Julie Wettersten, Leanne Sells, Jamilee Jack, and Julie Newsome's right to protect the health and safety of their minor child/children.

## COUNT IV - Violation of Tenth Amendment Against All Defendants

72.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

73.     Under the Tenth Amendment to the Constitution, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."

74.     The Supreme Court of the United States has determined that overreach by the federal government has in the past violated the Tenth Amendment of the United States Constitution found that federal overreach has in the past violated the Tenth Amendment. See *Printz v. United States*, 521 U.S. 898 (1997).

75.     Defendants have violated Plaintiffs' Tenth Amendment rights infringing upon their rights, along with the rights of other students, parents, and school staff through violating Plaintiff's rights under Article 1, § 21 of the Ohio Constitution, pertaining to the preservation of the freedom to choose health care and health care coverage.

## COUNT V - Violation of OH Const. Art. I, § 21 Against All Defendants

76.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

77.     Article 1, § 21 of the Ohio Constitution, pertaining to the preservation of the freedom to choose health care and health care coverage, provides,

> (A) No federal, state, or local law or rule shall compel, directly or indirectly, any person, employer, or health care provider to participate in a health care system.

(B) No federal, state, or local law or rule shall prohibit the purchase or sale of health care or health insurance.

(C) No federal, state, or local law or rule shall impose a penalty or fine for the sale or purchase of health care or health insurance.

(D) This section does not affect laws or rules in effect as of March 19, 2010; affect which services a health care provider or hospital is required to perform or provide; affect terms and conditions of government employment; or affect any laws calculated to deter fraud or punish wrongdoing in the health care industry.

(E) As used in this Section,

(1) "Compel" includes the levying of penalties or fines.

(2) "Health care system" means any public or private entity or program whose function or purpose includes the management of, processing of, enrollment of individuals for, or payment for, in full or in part, health care services, health care data, or health care information for its participants.

(3) "Penalty or fine" means any civil or criminal penalty or fine, tax, salary or wage withholding or surcharge or any named fee established by law or rule by a government established, created, or controlled agency that is used to punish or discourage the exercise of rights protected under this section.

78. Article I, § 21 of the Ohio State Constitution expressly prohibits federal, state, and local laws or rules from compelling, directly or ***indirectly***, any person, employer, or health care provider to participate in a health care system. Thus, the Constitution of the State of Ohio unambiguously affords individuals like Julie Wettersten, Jamilee Jack, Leanne Sells, and Julie Newsome the right to seek redress from the courts when unconstitutional actions, whether directly or indirectly, infringe upon the rights of Ohioans.

36

79. Because the universal mask mandate unconstitutionally places I.W., H.P., K.C. and K.C., C.N., G.N., and S.N. in danger of suffering irreparable and immediate injury, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase, the universal mask mandate implemented by Defendants violates Plaintiffs' rights under Article I, § 21 of the Ohio State Constitution.

### COUNT VI - Violation of Procedural Due Process
### (OH Const. Art. I, § 16) Against All Defendants

80. Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

81. Article 1, § 16 of the Ohio Constitution provides, "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay. Suits may be brought against the state, in such courts and in such manner, as may be provided by law."

82. Article 1, § 16 of the Ohio Constitution affords the people of Ohio with right to be free from violations of the procedural due process rights, and no person may be deprived of life, liberty, or property without due process of law.

83. Plaintiffs have constitutionally protected interests in the benefits that come from the not being subject to the Board's mask mandate, including the ability to pursue an education without being subjected to health risks that are not offset by any scientifically provable benefits.

84. Defendants' implementation of the mask policy unlawfully deprives

Plaintiffs of these and other constitutionally-protected interests without due process of law. Such deprivation occurred with no notice or meaningful opportunity to be heard as the Superintendent instated the mask mandate prior to offering an opportunity for public discussion. Such deprivation was arbitrary, capricious, based on ignorance without inquiry into facts, and in violation of the School Board's own policies and other applicable laws. Such deprivation violates Article 1, § 16 of the Ohio Constitution.

85.     Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

## COUNT VII - Violation of Substantive Due Process
### (OH Const. Art. I, § 16) Against All Defendants

86.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

87.     Article 1, § 16 of the Ohio Constitution provides, "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay. Suits may be brought against the state, in such courts and in such manner, as may be provided by law."

88.     Article 1, § 16 of the Ohio Constitution affords the people of Ohio with right to be free from violations of the procedural due process rights, and no person may be deprived of life, liberty, or property without due process of law.

89.     Under Article 1, § 16 of the Ohio Constitution, and as established by

38

state law including the state created danger doctrine, Plaintiffs have a fundamental right to a public education and to an education in a safe and healthy environment.

90.    Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

## RESERVATION OF RIGHTS

Plaintiffs herein expressly reserve their rights in regards to any additional claims to which they may be entitled under federal law as well as under the laws of the State of Ohio, including claims arising from any violations of Ohio's Open Meetings Laws or other actions of misconduct that may have been committed by Defendants. Plaintiffs expressly place Defendants on notice of Plaintiffs' intention to initiate removal proceedings at the state court level against Defendants as a result of the infractions Defendants have committed, as described herein.

## REQUEST FOR A JURY TRIAL

Plaintiffs herein expressly request that this matter be tried by a jury in regards to all such triable issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief:

Assume jurisdiction of this action;

a. Vacate and set aside the Defendants' mask mandate as well as any other action taken by Defendants to institute the mask mandate and implement the provisions of the mask policy;

b. Declare that the Defendants' masking policy is void and without legal force or effect;

c. Declare that the institution of the mask policy and actions taken by Defendants to implement the mask policy are arbitrary, capricious, based on ignorance due to failure to inquire into facts, otherwise not in accordance with law, and without observance of required procedures;

d. Declare that the mask policy and the actions taken by Defendants to implement the mask policy are in violation of the Constitution and contrary to the laws of the United States and the State of Ohio;

e. Temporarily restrain, as well as preliminarily and permanently enjoin Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, from implementing or enforcing the mask policy and from taking any other action to implement the masking policy that is not in compliance with applicable law;

f. Grant Plaintiffs' request for a trial by jury of all such triable issues in this matter; and

g. Grant such other and further relief as may be just, equitable, and proper including without limitation, an award of attorneys' fees and costs to Plaintiffs.

Respectfully submitted this 1st day of November, 2021.

/s/ *Julie Wettersten*

536 Linn St.

Chillicothe, OH 45601

740-720-0977 (Telephone)

Julie Wettersten and I.W. by and through his parent, Julie Wettersten


/s/ *Leanne Sells*

953 Dayton St.

Chillicothe, OH 45601

740-542-2368

Leanne Sells and H.P. by and through his parent, Leanne Sells


/s/ *Jamilee Jack*

*98 W. Main St.*

Chillicothe, OH 45601

740-600-5183

Jamilee Jack and K.C. and K.C. by and through their parent, Jamilee Jack


/s/ *Julie Newsome*

792 Cliffside Dr.

Chillicothe, OH 45601

740-804-5564

Julie Newsome and C.N., G.N., and S.N. by and through their parent, Julie Newsome